HENRY, J.,
concurring in part and dissenting in part.
I concur in the majority’s holding that Mr. Kidneigh’s Colorado bad faith claim is foreclosed by ERISA conflict preemption. See Maj. Op. at 1184-1186. Because I agree that “preemption of Mr. Kidneigh’s bad faith claim ... entail[s] preemption of Mrs. Kidneigh’s loss of consortium claim,” id. at 1189, I therefore also concur in the ultimate holding that the Kidneighs’ claims are “preempted by ERISA.” Id. at 1189. My agreement with the majority, however, ends there.
Two aspects of the majority’s reasoning concern me. First, the majority’s ERISA *1190 direct preemption analysis, see id. at 1186-1189, is unnecessary to our ultimate holding. Second, the majority’s conclusion following that analysis, that Mr. Kidneigh’s Colorado insurance bad faith claim is foreclosed by ERISA direct preemption, is problematic.
A. The Majority’s Direct Preemption Analysis is Unnecessary
Justice Breyer has warned of the need in certain situations for “judicial caution and humility.”[1] This is one of those situations: we should be very careful in invalidating state legislatures’ actions under federal law. To decide this case, we did not need to go any further than the majority’s concise and correct application of the ERISA conflict preemption rules from Rush Prudential HMO, Inc. v. Moran, 536 U.S. 355, 375, 122 S.Ct. 2151, 153 L.Ed.2d 375 (2002), and Conover v. Aetna U.S. Health Care, Inc., 320 F.3d 1076 (10th Cir.2003), to the remedies sought by the plaintiffs. See Maj. Op. at 1184-1186.
“This court considers itself bound by Supreme Court dicta almost as firmly as by the Court’s outright holdings, particularly when the dicta is recent and not enfeebled by later statements.” Gaylor v. United States, 74 F.3d 214, 217 (10th Cir.1996) (emphasis supplied). As the majority explains, see Maj. Op. at 1184-1186, a state law regulating insurance is foreclosed by ERISA conflict preemption if it allows plan participants to obtain remedies not available under ERISA. And as the majority concedes, see id. at 1186, the Supreme Court has made clear that if a state law claim is foreclosed by ERISA conflict preemption, that claim is foreclosed regardless of whether the law on which the claim is based is, or is not, foreclosed by the doctrine of direct preemption. See Rush, 536 U.S. at 377, 122 S.Ct. 2151 (“Although we have yet to encounter a forced choice between the congressional policies of exclusively federal remedies and the reservation of the business of insurance to the States, we have anticipated such a conflict, with the state insurance regulation losing out if it allows plan participants to obtain remedies that Congress rejected in ERISA ”) (internal citations and quotation marks omitted) (emphasis supplied); Boggs v. Boggs, 520 U.S. 833, 841, 117 S.Ct. 1754, 138 L.Ed.2d 45 (1997) (“We can begin, and in this case end, the analysis by simply asking if state law conflicts with the provisions of ERISA or operates to frustrate its objects. We hold that there is a conflict, which suffices to resolve the case. We need not inquire whether the statutory phrase ‘relate to’ provides further and additional support for the pre-emption claim.”) (emphasis supplied); cf. Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 142, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990) (“Even if there were no express pre-emption in this case, the Texas cause of action would be pre-empted because it conflicts directly with an ERISA cause of action.”) (emphasis supplied).
Indeed, on several occasions, the Supreme Court has addressed conflict preemption as a basis independent of direct preemption for holding that ERISA superseded the common law tort claim in a given case. See Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 51-57, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987); Ingersoll-Rand, 498 U.S. at 142-45, 111 S.Ct. 478. Significantly, in its recent ERISA preemption cases the Court has assumed that ERISA conflict preemption could foreclose a state claim even if the state law in question fell within ERISA’s insurance savings clause. See, e.g., Rush, 536 U.S. at 374-87, 122 S.Ct. 2151 (performing ERISA conflict preemption after rejecting an ERISA direct preemption claim); UNUM *1191 Life Ins. Co. of Am. v. Ward, 526 U.S. 358, 375-77, 119 S.Ct. 1380, 143 L.Ed.2d 462 (1999) (same).
The necessary logical predicate of these cases is that ERISA direct preemption and ERISA conflict preemption operate independently from each other. Put another way, a state statute is preempted, and a claim based on that statute foreclosed, when the party asserting ERISA preemption satisfies the applicable standard for either of the two main flavors of ERISA preemption, direct or conflict. When one of those two types of ERISA preemption is demonstrated, it is wholly unnecessary for a court to engage in analysis of whether the other ERISA preemption doctrine applies. The majority does not attempt to dispute this principle.
Nonetheless, the majority, having correctly determined that the claims are barred by ERISA conflict preemption, ventures unnecessarily and at length further down that “treacherous path,” as it accurately terms ERISA preemption analysis, Op. at 1184, by engaging in ERISA direct preemption analysis. The majority makes an ERISA direct preemption holding “in the alternative,” Maj. Op. at 1186, reaching to interpret as a matter of first impression the test recently announced in Kentucky Ass’n of Health Plans, Inc. v. Miller, — U.S. -, 123 S.Ct. 1471, 155 L.Ed.2d 468 (2003). Although such certainty and courage may in some contexts warrant admiration, I am concerned that the majority misapplies Miller. I therefore address also the majority’s ERISA direct preemption analysis.
B. Colorado’s Insurance Bad Faith Law is Not Foreclosed by ERISA Direct Preemption
1. ERISA’s Direct Preemption and Insurance Savings Clauses
ERISA “comprehensively regulates employee pension and welfare plans.” Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 724, 732, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985). Benefit providers may either self-insure or purchase insurance for their beneficiaries. See id. Plans such as the Kidneighs’ that purchase insurance “are directly affected by state laws that regulate the insurance industry.” Id. The question in such cases becomes whether the state law at issue is preempted by ERISA. ERISA contains an express, or direct, preemption provision, which states that ERISA “shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan.” 29 U.S.C. § 1144(a); see also Conover, 320 F.3d at 1079.
In a legislative act that the Supreme Court has described politely as “perhaps ... not a model of legislative drafting,” Metropolitan Life, 471 U.S. at 739, 105 S.Ct. 2380, Congress, despite the breadth of ERISA’s direct preemption clause, followed that clause with an insurance savings clause, which “saves from preemption state laws ‘regulating] insurance.’ ” Conover, 320 F.3d at 1078 (quoting 29 U.S.C. § 1144(b)(2)(A)). The insurance savings clause “reclaims a substantial amount of ground with its provision that ‘nothing in this subchapter shall be construed to exempt or reheve any person from any law of any State which regulates insurance.’ ” Rush, 536 U.S. at 364, 122 S.Ct. 2151 (quoting 29 U.S.C. § 1144(b)(2)(A)).
Thus, “employee benefit plans that are insured are subject to indirect state insurance regulation.” FMC Corp. v. Holliday, 498 U.S. 52, 61, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990). “An insurance company that insures a plan remains an insurer for purposes of state laws purporting to regulate insurance.” Id. (internal quotation marks omitted). “The insurance company is therefore not relieved from state insurance regulation.” Id. (emphasis supplied). The *1192 Supreme Court has noted that this distinction reflects “the presumption that Congress does not intend to pre-empt areas of traditional state regulation.... Congress provided that the ‘business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.’ ” Id. at 62, 111 S.Ct. 403 (quoting 15 U.S.C. § 1012(a)) (emphasis supplied).
It is undisputed that the Kidneighs’ claims “relate” to an -employee benefit plan. Thus, resolution in this case of whether ERISA direct preemption applies turns on whether Colorado’s insurance bad faith law “escape[s] preemption under the saving clause.” Ward, 526 U.S. at 367,119 S.Ct. 1380 (citing 29 U.S.C. § 514(b)(2)(A)). “To determine whether [Colorado’s laws] are saved from preemption, we must ascertain whether they are ‘laws ... which regulate insurance’ under § 1144(b)(2)(A).” Miller, — U.S. at -, 123 S.Ct. at 1475.
2. Applying Miller
The Supreme Court’s most recent interpretation of § 1144’s “regulate insurance” language came in Miller, — U.S. -, 123 S.Ct. 1471, 155 L.Ed.2d 468, a unanimous decision handed down in April of this year. The majority states that Miller effected merely a change in the “precise formulation of the test for analyzing ERISA preemption cases.” Maj. Op. at 1188. However, as recognized by the only circuit decision to interpret Miller, Miller announced a “change in the law involving § 1144.” Elliot v. Fortis Benefits Ins. Co., 337 F.3d 1138, 1145 (9th Cir.2003) (noting that under the new risk standard, state laws might be found to regulate insurance “under a much wider variety of statutes” than earlier Supreme Court caselaw suggested) (emphasis supplied). See also Rosenbaum v. Unum Life Ins. Co. of Am., 2003 WL 22078557 (E.D.Pa. Sept.8, 2003); 2 Guide to Employment Law and Regulation § 19:39 (June 2003) (noting that “[t]he rationale utilized by the Supreme Court [in Miller ] is contrary to its previous decisions that set forth a test for determining whether laws regulate insurance within the meaning of ERISA.”).
Indeed, prior to Miller, courts were required to follow the test set forth in Metropolitan Life: (1) asking whether, from a “common-sense view of the matter,” a state law “regulates insurance,” and (2) testing that result against the factors interpreting the “business of insurance” antitrust exemption in the McCarran-Ferguson Act. Metropolitan Life, 471 U.S. at 743, 105 S.Ct. 2380; Conover, 320 F.3d at 1078. The Court in Miller explained that its “prior decisions construing § 1144(b)(2)(A) have relied, to varying degrees, on our cases interpreting §§ 2(a) and 2(b) of the McCarran-Ferguson Act.” — U.S. at -, 123 S.Ct. at 1478 (emphasis supplied). “In determining whether certain practices constitute ‘the business of insurance’ under the McCar-ran-Ferguson Act,” noted the Court, “our cases have looked to three factors: first, whether the practice has the effect of transferring or spreading a policyholder’s risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry.” Id. (internal quotation marks omitted) (emphasis deleted).
The Court then indicated its dissatisfaction with the pre-Miller doctrine:
our use of the McCarran-Ferguson case law in the ERISA context has misdirected attention, failed to provide clear guidance to lower federal courts, and, as this case demonstrates, added little to the relevant analysis. That is unsurprising, since the statutory language of *1193 § 1144(b)(2)(A) differs substantially from that of the McCarran-Ferguson Act.

Id.

The Court then made new law and announced a two-part test:
Today we make a dean break from the McCarran-Ferguson factors and hold that for a state law to be deemed a “law ... which regulates insurance” under § 1144(b)(2)(A), it must satisfy two requirements. First, the state law must be specifically directed toward entities engaged in insurance. Second, as explained above, the state law must substantially affect the risk pooling arrangement between the insurer and the insured.
Id. at 1479 (internal quotation marks and select internal citations omitted) (emphasis supplied).
Thus, under Miller, we analyze whether Colorado’s insurance bad faith law “regulates insurance,” and therefore falls within ERISA’s insurance savings clause. 29 U.S.C. § 1144(b)(2)(A). In this context, we examine both Colorado’s decisional and statutory law. See Winchester v. Prudential Life Ins. Co. of Am., 975 F.2d 1479, 1484 n. 5 (10th Cir.1992). As the majority acknowledges, see Maj. Op. at 1188, we thus ask whether Colorado’s insurance bad faith law is (1) “specifically directed toward entities engaged in insurance,” Miller, — U.S. at —, 123 S.Ct. at 1479; and (2) “substantially affect[s] the risk pooling arrangement between the insurer and the insured.” Id. However, the majority’s cramped interpretation of Miller infects its analysis on both Miller prongs.
a. Specifically directed towards entities engaged in the insurance industry
The majority concludes that Colorado’s insurance bad faith law is not specifically directed at entities engaged in the insurance industry, reasoning that Colorado courts have “not exclusively [] confined bad faith causes of action to the insurance setting.” Maj. Op. at 1186. In doing so, the majority erroneously conflates two separate causes of action that happen to include the words “bad faith,” but are quite distinct under well-settled Colorado law.
The first such cause of action is a bad faith claim that sounds in contract and arises from an alleged breach of the implied covenant of good faith and fair dealing that Colorado imports into every contract. See, e.g., Maj. Op. at 1186 (citing Rogers v. Westerman Farm Co., 29 P.3d 887, 908 (Colo.2001) (claim against oil company for breach of implied covenant of good faith and fair dealing), and Amoco Oil Co. v. Ervin, 908 P.2d 493, 498 (Colo.1995) (same)). The second is an insurance bad faith claim that sounds in tort and exists solely due to the unique relationship of a surety — insured such as that present in the cases cited by the majority. See Maj. Op. at 1186 (citing Dale v. Guar. Nat’l Ins. Co., 948 P.2d 545, 552 (Colo.1997) (analyzing “the tort of bad faith breach of insurance contract”), and Vaughan v. McMinn, 945 P.2d 404, 406 (Colo.1997) (“A breach of the covenant of good faith and fair dealing by an insurer may give rise to tort liability. The basis for this liability is the special nature of the insurance contract relative to other types of contracts.”)).
Contrary to the majority’s insistence, in Colorado, “[c]laims for bad faith breach ... of an insurance contract sound in tort .... [and] exist independently of the liability imposed by an insurance contract.” Pham v. State Farm Mut. Auto. Ins. Co., 70 P.3d 567, 571 (Colo.Ct.App.2003) (emphasis supplied) (citing Daugherty v. Allstate Ins. Co., 55 P.3d 224 (Colo.Ct.App.2002), and Flickinger v. Ninth Dist. Prod. *1194 Credit Ass’n, 824 P.2d 19 (Colo.Ct.App.1991)). Accordingly, Colorado courts have analyzed bad faith claims brought against insurers not in terms of general “bad faith” claims, but specifically as “insurance bad faith claim[s]." Dale, 948 P.2d at 551 (emphasis supplied); see also Herod v. Colo. Farm Bur. Mut. Ins. Co., 928 P.2d 834, 835 (Colo.Ct.App.1996) (stating that in “cases in which the insured brings an action against the insurer, the insurer’s denial of a valid claim will constitute bad faith if the insurer’s conduct is unreasonable and it knows that the conduct is unreasonable or recklessly disregards the fact that the conduct is unreasonable”). Indeed, earlier this year, the Colorado Supreme Court reaffirmed that “[t]he basis for liability in tort for the breach of an insurer’s implied duty of good faith and fair dealing is grounded upon the special nature of the insurance contract and the relationship which exists between the insurer and the insured.” Cary v. United of Omaha Life Ins. Co., 68 P.3d 462, 467 (Colo.2003) (quoting Travelers Ins. Co. v. Savio, 706 P.2d 1258, 1272 (Colo.1985) (emphasis supplied)).
That there is a distinct body of insurance bad faith law pertaining to the insurance industry is no mere tautology. Insurance-specific policy considerations underlie Colorado’s insurance bad faith tort cause of action. As the Colorado Supreme Court has explained, the doctrine reflects that “[t]he motivation of the insured when entering into an insurance contract differs from that of parties entering into an ordinary commercial contract.” Cary, 68 P.3d at 467 (internal quotation marks and citation omitted). “[A]n insurer in contractual privity with an insured, has a financial incentive to use its leverage to limit claims,” id., the Colorado Supreme Court has noted, because “once a calamity has befallen an employee covered by workers compensation or an insured covered under a private insurance contract, the injured party is particularly vulnerable because of the injury or loss.” Id. (internal quotations and citation omitted) (emphasis supplied).
The concern expressed by the Colorado Supreme Court is that large-scale “[ijnsur-ers, backed by sufficient financial resources, are encouraged to delay payment of claims to their insureds with an eye toward settling for a lesser amount than due under the policy.” Id. (internal quotation marks omitted). Regarding claims for disability coverage, the Colorado Supreme Court has noted that “[t]he inequity of this situation becomes particularly apparent in the area of disability insurance in which the insured [is] often pursued by creditors and devoid of bargaining power.” Id. (internal quotation marks omitted).
The Colorado legislature has similarly carved out a distinct set of laws applicable to insurance companies’ bad faith behavior. The majority’s conclusion that Colorado’s insurance' bad faith law is not specifically directed towards entities engaged in insurance lies in contrast with the following. In 1987, the Colorado legislature amended the Chapter 65 of its civil code, the chapter addressing “The Regulation of Insurance Companies.” In an Act titled, “Concerning Remedies for Persons Injured by Acts of Insurance Companies Which Constitute Unfair Settlement Practices,” 1987 Colo. Leg. Sess., Vol. I at 423, the Colorado legislature enacted § 10-3-1113 to supplement the state’s common law insurance bad faith tort law. See id. at 423-424 (codifying the enactment of Colo. Stat. §§ 10-3-1113 and 10-3-1114). See also Col.Rev.Stat. § 10-3-1114 (“Nothing in this part ... shall be construed to ... abrogate any common law contract or tort cause of action.”). The statute provides a standard applicable only to bad faith claims against insurance providers; it mandates jury instructions that shall apply *1195 in a bad faith claim “[i]n any civil action for damages founded upon contract, or tort, or both against an insurance company,” and states that “the trier of fact may be instructed that the insurer owes its insured the duty of good faith and fair dealing, which duty is breached if the insurer delays or denies payment without a reasonable basis for its delay or denial.” Col.Rev.Stat. § 10-3-1113.
Section 10-3-1113(4) states that “[i]n determining whether an insurer’s delay or denial was reasonable, the jury may be instructed that willful conduct of the kind set forth in sections 10 — 3—1104(1)(h)(I) to (l)(h)(XrV) is prohibited and may be considered if the delay or denial and the claimed injury, damage, or loss was caused by or contributed to by such prohibited conduct.” Those provisions define “as unfair methods of competition and unfair or deceptive acts or practices in the business of insurance ” (emphasis supplied), numerous and unmistakable references to the conduct of insurance companies, including
Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies; or
Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies; or
Refusing to pay claims without conducting a reasonable investigation based upon all available information; or Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed; or
Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear; or
Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds; or
Attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application;
Col.Rev.Stat. § 10-3-1104(l)(h)(II) (VIII) (emphasis supplied).
Both this statute’s insurance-specific standard for any suit alleging a bad faith tort claim brought by an insured against a direct insurance provider such as UNUM, and the Colorado common law governing insurance bad faith torts under standards specific to the insurance setting, are thus distinct in a meaningful way from the contract law bad faith cause of action the majority repeatedly invokes.
Further evidence of this distinction is that the type of bad faith claim at issue here has, contrary to the majority’s assertion, see Maj. Op. at 1186, been cabined exclusively to the insurance setting. Unlike the laws of certain jurisdictions cited by the majority, see Maj. Op. at 1185 and 1188, the statutory and common law rules governing insurance bad faith tort law in Colorado have not been extended to other situations where special circumstances create unique duties. Compare, e.g., Moffett v. Halliburton Energy Servs., Inc., 291 F.3d 1227, 1236 (10th Cir.2002) (in holding that Wyoming’s bad faith law did not regulate insurance, emphasizing that “the tort of bad faith breach as developed in Wyoming is not unique to the insurance industry; rather, it is unique to those settings in which a ‘special relationship’ exists, including the insurance and employment contexts”) with Decker v. Browning-Ferris Indus. of Colo., Inc., 931 P.2d 436, 446 (Colo.1997) (noting that “the torts of wrongful discharge in violation of public *1196 policy and bad faith breach of the implied covenant of good faith and fair dealing inherent in insurance contracts are based on administrative or legislative declarations of public policy,” and concluding that “there is no appropriate basis upon which to ground a tort of breach of an express covenant of good faith and fair dealing in employment contracts ”) (emphasis supplied). Unlike the claim under Mississippi law for “tortious breach of contract” held to be preempted by ERISA in Pilot Life, 481 U.S. at 48, 107 S.Ct. 1549, insurance bad faith tort law in Colorado, in both common law and statute form, is entirely reflective of, and focused on, the insurance industry. Accord Elliot, 337 F.3d at 1145 (in analyzing a state law under Miller, asserting that the state law satisfies Miller’s first prong because the state law “by its very terms is directed at insurance, and contains provisions applicable only to insurance companies.”); Colligan v. UNUM Life Ins. Co. of Am., 2001 WL 533742, at *3 (D.Colo. April 23, 2001) (in denying an insurer’s motion to dismiss on ERISA preemption grounds a Colorado insurance bad faith claim, concluding that “Colorado’s bad faith cause of action is clearly distinguishable from the Mississippi cause of action at issue in Pilot Life ”).
Moreover, contrary to the exclusivity standard posited by the majority, even if there existed de minimus exceptions to Colorado’s exclusive application of insurance bad faith tort law to the insurance context, such exceptions would not preclude the Colorado law from falling within ERISA’s savings clause. The Court noted in Miller noted that “Petitioners maintain that the application to noninsuring HMOs forfeits the laws’ status as *law[s] ... which regulat[e] insurance.’ § 1144(b)(2)(A).” — U.S. at -- n. 1, 123 S.Ct. at 1476 n. 1 The court responded: “We disagree .... petitioners’ argument is foreclosed by Rush [ ] where we noted that Illinois’ independent-review laws contained ‘some overbreadth in the application of [the Illinois statute at issue] beyond orthodox HMOs,’ yet held that ‘there is no reason to think Congress would have meant such minimal application to noninsurers to remove a state law entirely from the category of insurance regulation saved from preemption.”’ Id. (quoting Rush, 536 U.S. at 372, 122 S.Ct. 2151) (emphasis supplied) (internal citation omitted). For these reasons, it is clear that Colorado’s insurance bad faith law is “specifically directed toward entities engaged in insurance.” Miller, — U.S. at -, 123 S.Ct. at 1479.
b. “Substantially affect the risk pooling arrangement between the insurer and the insured”
The majority also concludes that Colorado’s insurance bad faith law fails Miller’s second prong, which requires that for a state law to qualify as regulating insurance, it must “substantially affect the risk pooling arrangement between the insurer and the insured.” Id. To arrive at this conclusion, the majority relies heavily on Pilot Life, Kelley v. Sears, Roebuck & Co., 882 F.2d 453 (10th Cir.1989), (“The Kid-neighs fail to overcome Kelley’s prece-dential value in this case.”), and a number of other circuit court cases applying Pilot Life.
However, notwithstanding the majority’s assertions that because Pilot Life has not been completely overruled and that Pilot Life and its progeny in this circuit are therefore binding, those authorities’ prece-dential value on the precise issue of the “substantially affect” prong has been seriously eroded, if not eviscerated, by Miller. On this issue, the Court in Miller decidedly did not favorably cite to Pilot Life. Indeed, as another circuit court recently put it in assessing Pilot Life’s conclusions regarding risk, “subsequent case law puts the validity of ... these Pilot Life conclu *1197 sions into some doubt.” Elliot, 337 F.3d at 1144.
A comparison between the rule from Pilot Life and the new standards suggested by recent Supreme Court cases and expressly adopted in Miller shows how Pilot Life’s risk allocation analytical framework has been displaced by subsequent Supreme Court decisions. The Court in Pilot Life concluded that a claim brought under Mississippi common law for tortious breach of an insurance contract was “not saved by § 514(b)(2)(A),” and was therefore foreclosed by ERISA direct preemption. 481 U.S. at 57, 107 S.Ct. 1549. In so holding, the Court emphasized that the Mississippi common law claim at issue was “firmly planted in the general principles of Mississippi tort and contract law,” id. at 50, 107 S.Ct. 1549, reasoning that “the common law of bad faith does not define the terms of the relationship between the insurer and the insured; it declares only that, whatever terms have been agreed upon in the insurance contract, a breach of that contract may in certain circumstances allow the policyholder to obtain punitive damages,” id. at 51, 107 S.Ct. 1549, and stressing that “the Mississippi common law of bad faith does not effect a spreading of shareholder risk.” Id. at 50, 107 S.Ct. 1549.
Miller, in contrast, specifically disavowed the McCarran-Ferguson factors, including the test of “whether the practice has the effect of transferring or spreading a policyholder’s risk,” the test relied on in Pilot Life, 481 U.S. at 48, 107 S.Ct. 1549, and in Kelley, 882 F.2d at 456 (“Colorado’s common law of bad faith does not regulate insurance. It neither spreads policyholder risk nor controls the substantive terms of the insurance contract. See Pilot Life.”). The Court in Miller stated: “[0]ur test requires only that the state law substantially affect the risk pooling arrangement between the insurer and the insured; it does not require that the state law actually spread risk.” -— U.S. at - n. 3, 123 S.Ct. at 1477 n. 3 (all but second emphasis supplied). Perhaps animated by federalism concerns, Miller expanded the scope in ERISA direct preemption analysis as to what affects risks. The Court’s use of the word “only” to describe the new test shows that “[substantially affect[ing] the risk pooling arrangement between the insurer and the insured” is likely an easier hoop to jump through. See Elliot, 337 F.3d at 1145 (stating that Ward and Miller “leave open the possibility that risk spreading might be found in a much wider variety of statutes than Pilot Life suggested”) (emphasis supplied). Miller is the culmination, so far, of a clear trend by the Supreme Court to rein in ERISA direct preemption. Ward and Rush, the two ERISA direct preemption cases decided immediately prior to Miller, each concluded that the risk analysis did not justify ERISA direct preemption, as did Miller itself.
In Ward, 526 U.S. 358, 119 S.Ct. 1380, 143 L.Ed.2d 462, decided in 1999, the Court held that California’s notice-prejudice rule, under which an insurer could not deny benefits due to an insured’s late notice without showing that the insurer suffered prejudice, fell within ERISA’s savings clause. In so holding, the Court reasoned that “the rule controls the terms of the insurance relationship” and is directed at the insurance industry. Id. at 368, 119 S.Ct. 1380.
In Rush, 536 U.S. 355, 122 S.Ct. 2151, 153 L.Ed.2d 375, decided in 2002, the Court held that an Illinois law mandating a binding review by an independent physician following an insurer’s refusal to pay for surgery fell within the savings clause. The Court in Rush reasoned that “this effect of eliminating an insurer’s autonomy to guarantee terms congenial to its own *1198 interests is the stuff of garden variety-insurance regulation through the imposition of standard policy terms.” Id. at 387, 122 S.Ct. 2151.
Miller, decided unanimously earlier this year, analyzed whether Kentucky’s “Any Willing Provider” (“AWP”) statutes fell within ERISA’s savings clause. The AWP statutes required health insurance plans to provide access to the plans’ network to all health care providers in the plans’ geographic coverage region willing to meet insurer’s participation requirements. See Miller, — U.S. at -, 123 S.Ct. at 1473-74 (summarizing Ky.Rev.Stat. Ann. § 304.17A-270). Miller was the Court’s first-ever application of the “substantially affects” version of the risk prong. Holding that the AWP statutes satisfied the risk prong, the Court stated that the “rule [that] governs whether or not an insurance company must cover claims submitted late, which dictates to the insurance company the conditions under which it must pay for the risk that it has assumed .... certainly qualifies as a substantial effect on the risk pooling arrangement between the insurer and insured.” Id. at 1478 n. 3.
If, contrary to the Supreme Court’s teachings discussed earlier, it was necessary to address this matter, I would hold that Colorado’s insurance bad faith law fits within this unbroken line of recent Supreme Court cases as sufficiently affecting the pooling of risk to qualify as a regulation of insurance. As amended in 1987,[2] Colorado statutory law requires that insurers attempt to settle when liability becomes reasonably clear, and forbidding insurers from offering less than what a reasonable person would feel entitled to, Colorado’s insurance bad faith law “substantially affects the risk-pooling arrangement.” Even without the additional remedies foreclosed by ERISA conflict preemption, it tends to make it less likely that insureds will suffer from delayed settlement.
Colorado’s law effects this alteration of risk by making clear that such behavior may yield liability against the insurer, presumably altering the insurer’s incentives to play the “delay game” and drive down settlement amounts. By mandating that insurers attempt to settle when liability becomes reasonably clear and barring insurers from offering less than what a reasonable person would feel entitled to, Colorado’s insurance bad faith law “dictates to the insurance company the conditions under which it must pay for the risk it has assumed.” Miller, — U.S. at - n. 3, 123 S.Ct. at 1477 n. 3. Accord Elliot, 337 F.3d at 1145 (noting that Supreme Court decisions subsequent to Pilot Life “call[] into question Pilot Life’s conclusion that a claim processing law does not affect risk allocation”). The greater likelihood of the imposition of liability for bad faith behavior makes bad behavior more costly. As the cost of bad behavior rises, behavior tends to change. The statute thus changes the conditions under which an insurer will “pay for the risk that it has assumed,” Miller, — U.S. at - n. 3, 123 S.Ct. at 1478 n. 3, by making the law decisively clear that the risk of nonperformance in settlement negotiations lies with the insurer.
*1199 Colorado’s insurance bad faith law thus substantially affects the risk-pooling arrangement by giving insureds clear protection they did not previously possess in their settlement negotiation practices with insurers. Because this law satisfies both of the requisite elements to qualify as “regulating insurance,” it thus falls with ERISA’s savings clause.

CONCLUSION

ERISA was enacted as a balanced statute, offering certain protection to insurers while securing protection for insured patients who are at their most vulnerable when they suffer medical harm. Through the insurance savings clause, Congress specifically authorized the states to continue regulating the business practices of insurance companies. State regulation of insurance is an undeniably proper state function that permits states to respond to the specific aspects of their policy problems better than the one-size-fits-all approach the majority’s reading emphasizes. The majority’s approach helps dismantle the protective system devised by Colorado’s legislature and courts for Colorado’s citizens.
Because, under binding precedent of the Supreme Court and this court, Mr. Kid-neigh’s claim is foreclosed by ERISA conflict preemption, I respectfully concur in the majority’s disposition of this case. However, I do not join the majority’s ERISA direct preemption analysis because, for the reasons detailed above, it is both unnecessary and probably incorrect as a matter of law.

. Stephen Breyer, Our Democratic Constitution, 77 N.Y.U. L.Rev. 245, 261 (2002).

. The fact that the Colorado legislature passed the amendment at issue in this case in 1987 is an additional reason that Kelley, contrary to the majority's assertions, does not control. Though decided by this court in 1989, Kelley involved a claim brought under the Colorado bad faith statute as it stood prior to the important amendments enacted in 1987 to Colorado’s insurance bad faith statutory law. See Kelley, 882 F.2d at 455 {“[Kelley'] ... asserted causes of action under Colorado’s common law of bad faith insurance practices and Colo.Rev.Stat. § 10-3-1104 (1973)”).