**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 3 2003**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JON F. KIDNEIGH,

     Plaintiff/Cross-Appellee,

and BARBARA KIDNEIGH,

     Plaintiff - Appellant/Cross-
     Appellee,

v.

UNUM LIFE INSURANCE
COMPANY OF AMERICA, a Maine
corporation,

     Defendant - Appellee/Cross-
     Appellant.

---

COLORADO TRIAL LAWYERS
ASSOCIATION,

     Amicus Curiae.

No. 02-1277, 02-1282

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 02-Z-210 (OES))**

---

Stephen C. Kaufman, Denver, Colorado, for Plaintiffs - Appellants/Cross-
Appellees.

Michael S. Beaver, Holland & Hart, L.L.P., Greenwood Village, Colorado,

(Marcy G. Glenn and Jack M. Englert, Jr., Holland & Hart, L.L.P., Denver, Colorado, with him on the briefs), for Defendant - Appellee/Cross-Appellant.

Michael J. Rosenberg and Bradley A. Levin, Roberts, Levin & Patterson, P.C., Denver, Colorado, for Amicus Curiae Colorado Trial Lawyers Association.

---

Before **KELLY**, **HENRY**, and **HARTZ**, Circuit Judges.

---

**KELLY**, Circuit Judge.

---

Plaintiff/Cross-Appellee Jon Kidneigh and Plaintiff-Appellant/Cross-Appellee Barbara Kidneigh brought suit seeking disability benefits pursuant to 29 U.S.C. §§ 1132(a)(1)(B) and (g), the Employment Retirement Income Security Act of 1974 ("ERISA"), along with state law claims for bad faith and loss of consortium. We have jurisdiction under 28 U.S.C. § 1292(b), and we affirm in part and reverse in part.


Background

Plaintiff Jon Kidneigh brought a claim against UNUM Life Insurance Co. ("UNUM") seeking disability benefits pursuant to §§ 1132(a)(1)(B) and (g) of the Employment Retirement Income Security Act of 1974 ("ERISA"). UNUM is the claims administrator of a long-term disability plan covering employees of the law firm of Kidneigh & Kaufman, P.C. Though UNUM paid disability benefits to Mr. Kidneigh after a series of back and hernia surgeries, UNUM stopped paying

benefits on March 31, 1999, after determining that Mr. Kidneigh was physically capable of performing his job as an attorney.

Mr. Kidneigh also brought a state law claim for bad faith along with the direct ERISA claim seeking continued benefits, and his wife brought a state law claim for loss of consortium. UNUM moved to dismiss Mr. Kidneigh's bad faith claim and Mrs. Kidneigh's loss of consortium claim on the grounds that both are preempted by ERISA. The district court denied the motion with respect to Mr. Kidneigh but granted the motion with respect to Mrs. Kidneigh. The district court granted an unopposed motion for interlocutory appeal brought pursuant to Fed. R. Civ. P. 52(b), finding that the issue "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). Both Mrs. Kidneigh and UNUM appeal from the district court's order; Mrs. Kidneigh appeals from the dismissal of her loss of consortium claim, and UNUM appeals from the denial of the motion to dismiss Mr. Kidneigh's bad faith claim.

## Discussion

Because the scope of ERISA preemption is a question of law, the district court's decision is subject to de novo review. Conover v. Aetna US Health Care,

Inc., 320 F.3d 1076, 1077 (10th Cir. 2003).

"[A]ny court forced to enter the ERISA preemption thicket sets out on a treacherous path." Gonzales v. Prudential Ins. Co., 901 F.2d 446, 451-52 (5th Cir. 1990). In this case we must resolve whether a Colorado state law bad faith claim against an employment disability insurance provider is preempted by ERISA. A secondary issue is whether a spouse's derivative loss of consortium claim is also preempted by ERISA.

The issue here is one that frequently confronts the federal courts due to ERISA's "statutory complexity." Metro. Life Ins. Co. v. Mass., 471 U.S. 724, 740 (1985). ERISA's preemption clause broadly states that "[e]xcept as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). What Congress took away with one hand, however, it gave back with the other as contained in ERISA's saving clause: "Except as provided in subparagraph (B), nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities." Id. § 1144(b)(2)(A). Subparagraph (B) (the deemer clause), in turn, provides:

> Neither an employee benefit plan . . . nor any trust established under such a plan, shall be deemed to be an insurance company or other insurer, bank, trust company, or investment company or to be engaged in the business of insurance or banking for purposes of any

law of any State purporting to regulate insurance companies, insurance contracts, banks, trust companies, or investment companies.

Id. § 1144(b)(2)(B). As summarized by the Supreme Court:

If a state law "relate[s] to . . . employee benefit plan[s]," it is pre-empted. The saving clause excepts from the pre-emption clause laws that "regulat[e] insurance." The deemer clause makes clear that a state law that "purport[s] to regulate insurance" cannot deem an employee benefit plan to be an insurance company.

Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 45 (1987) (citations omitted). The Supreme Court has further noted that "[t]he pre-emption clause is conspicuous for its breadth," FMC Corp. v. Holliday, 498 U.S. 52, 58 (1990), and that "the express pre-emption provisions of ERISA are deliberately expansive, and designed to 'establish pension plan regulation as exclusively a federal concern.'" Pilot Life, 481 U.S. at 45-46.

In addition to Congress's power to "define explicitly the extent to which its enactments pre-empt state law," a state law can also be preempted "to the extent that it actually conflicts with federal law." English v. Gen. Elec. Co., 496 U.S. 72, 78-79 (1990). Where a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," then the state law is preempted. Hines v. Davidowitz, 312 U.S. 52, 67 (1941). State law causes of action, then, are preempted under ERISA both when they are expressly preempted by the terms of the statute as well as when the state law provides remedies beyond

those contained in ERISA itself. See Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 143-44 (1990); Pilot Life, 481 U.S. at 54 ("The deliberate care with which ERISA's civil enforcement remedies were drafted and the balancing of policies embodied in its choice of remedies argue strongly for the conclusion that ERISA's civil enforcement remedies were intended to be exclusive."). The Supreme Court has noted that a distinction can be drawn between cases involving an "additional claim or remedy," such as Pilot Life, and cases "bear[ing] a resemblance to the claims-procedure rule" sustained in UNUM Life Ins. Co. of Am. v. Ward, 526 U.S. 358, 368 (1999). Rush Prudential HMO, Inc. v. Moran, 536 U.S. 355, 380 (2002). Cases on the former side of the distinction fall within "Pilot Life's categorical preemption." Id.

We hold that Colorado bad faith claims are preempted by ERISA because they conflict with ERISA's remedial scheme. State law bad faith claims such as the Colorado claim in this case–insofar as they provide an "additional claim" to plaintiffs–clearly fall on the former side of the distinction drawn in Rush Prudential and "fit within the category of state laws Pilot Life had held to be incompatible with ERISA's enforcement scheme" by "provid[ing] a form of ultimate relief in a judicial forum that add[s] to the judicial remedies provided by ERISA." Id. at 379.

As this court explained recently, "Nowhere does [ERISA] allow

consequential or punitive damages.  Damages are limited to the recovery of 'benefits due . . . under the terms of the plan.'"  Conover, 320 F.3d at 1080 (alteration in original).  The Oklahoma bad faith claim in Conover, like the Colorado bad faith claim here, "allows plan participants to obtain 'consequential and, in a proper case, punitive, damages' for breach of good faith and fair dealing by an insurer."  Id.  Where such damages are available, they "provide[] a cause of action excluded from [ERISA's] civil enforcement scheme and would therefore 'pose an obstacle to the purposes and objectives of Congress.'"  Id. (quoting Gaylor v. John Hancock Mut. Life Ins. Co., 112 F.3d 460, 466 (10th Cir. 1997)); see also Moffett v. Halliburton Energy Servs., Inc., 291 F.3d 1227, 1237 (10th Cir. 2002).

The Supreme Court has strongly indicated in dicta that a state law falling within ERISA's savings clause ("nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance," 29 U.S.C. § 1144(b)(2)(A)) would still be preempted merely by providing remedies beyond those prescribed in ERISA.  See Rush Prudential, 536 U.S. at 377 (2002) ("Although we have yet to encounter a forced choice between the congressional policies of exclusively federal remedies and the 'reservation of the business of insurance to the States,' we have anticipated such a conflict, with the state insurance regulation losing out if it allows plan participants 'to obtain

remedies . . . that Congress rejected in ERISA.'") (citations omitted).  In addition to being preempted due to conflict with ERISA's remedial scheme, we are persuaded that–in the alternative–the Colorado bad faith claim in this case does not fall within ERISA's savings clause, and as such is expressly preempted.

It is undisputed that the Kidneighs' claims "relate" to an employee benefit plan, and so our inquiry on this aspect of preemption moves to the second phase of determining whether Colorado bad faith law "regulates insurance."  In light of the case law in this area, our conclusion is that it does not.  The Supreme Court's recent decision in <u>Kentucky Ass'n of Health Plans, Inc. v. Miller</u>, 123 S. Ct. 1471 (2003) (holding Kentucky's "Any Willing Provider" statute not preempted by ERISA), substantially clarified the test for determining when a state law is not preempted by ERISA because it "regulates insurance" under § 1144(b)(2)(A): "First, the state law must be specifically directed toward entities engaged in insurance," and "[s]econd . . . the state law must substantially affect the risk pooling arrangement between the insurer and the insured."  123 S. Ct. at 1479.

Tested against these two factors, we hold, as noted above, that a Colorado state law bad faith cause of action against an ERISA provider is expressly preempted.  In order to be characterized as a state law "regulating insurance," the law must not "just have an impact on the insurance industry" but must be "specifically directed toward that industry."  <u>Pilot Life</u>, 481 U.S. at 50.  Stated

otherwise, the state law must "home[] in on the insurance industry." Ward, 526 U.S. at 368.

The Colorado courts do appear to have largely (but, importantly, not exclusively) confined bad faith causes of action to the insurance setting. See Dale v. Guar. Nat'l Ins. Co., 948 P.2d 545, 552 (Colo. 1997); Vaughan v. McMinn, 945 P.2d 404, 406 (Colo. 1997). But see Rogers v. Westerman Farm Co., 29 P.3d 887, 908 (Colo. 2001) (bad faith claim applied to oil and gas leases); Amoco Oil Co. v. Ervin, 908 P.2d 493, 498 (Colo. 1995) ("Colorado, like the majority of jurisdictions, recognizes that every contract contains an implied duty of good faith and fair dealing. . . . The good faith performance doctrine is generally used to effectuate the intentions of the parties or to honor their reasonable expectations.") (emphasis added). Even if the Colorado state courts had limited bad faith claims to the insurance context, however, that fact alone would not save Colorado bad faith claims from ERISA preemption. The Supreme Court's Pilot Life decision, in which Mississippi's bad faith cause of action was held to be preempted by ERISA, dealt with a state bad faith law apparently confined by a state supreme court to insurance contracts. "Even though the Mississippi Supreme Court has identified its law of bad faith with the insurance industry, the roots of this law are firmly planted in the general principles of Mississippi tort and contract law," and so the Court held that the Mississippi law

did not "regulate insurance."  481 U.S. at 50; see also Gaylor v. John Hancock

Mut. Life Ins. Co., 112 F.3d 460, 466 (10th Cir. 1997) ("[A]lthough Oklahoma's

bad faith law is specifically directed at the insurance industry, we note that, like

the bad faith law in Pilot Life, its origins are from general principles of tort and

contract law."); Halprin v. Equitable Life Assurance Soc., 267 F. Supp. 2d 1030,

1038 (D. Colo. 2003)[1] (following Kelley v. Sears, Roebuck & Co., 882 F.2d 453

(10th Cir. 1989), and holding Colorado's bad faith law preempted; subsequent

Colorado case law developments merely described, but did not change, the

development of bad faith).

As to the second factor in ERISA express preemption analysis, Pilot Life

and other ERISA preemption cases show that state bad faith claims do not

"substantially affect the risk pooling arrangement" between insurers and their

insureds, which is the hallmark of insurance contracts.  See SEC v. Variable

Annuity Life Ins. Co. of Am., 359 U.S. 65, 73 (1959).  State law bad faith claims

are not integral to the risk pooling arrangement for the reasons summarized in

Pilot Life:

> In contrast to the mandated-benefits law in Metropolitan Life, the
> common law of bad faith does not define the terms of the relationship
> between the insurer and the insured; it declares only that, whatever

---

[1]  Thus, we reject Colligan v. UNUM Life Ins. Co. of Am., No. Civ.A. 00-K-2512, 2001 WL 533742 (D. Colo. April 23, 2001), which held that Colorado's bad faith law was not preempted without citation or discussion Kelley.

terms have been agreed upon in the insurance contract, a breach of that contract may in certain circumstances allow the policyholder to obtain punitive damages. The state common law of bad faith is therefore no more "integral" to the insurer-insured relationship than any State's general contract law is integral to a contract made in that State.

481 U.S. at 51.

Any-willing provider statutes, notice-prejudice rules, and independent review provisions all "substantially affect[] the type of risk pooling arrangements that insurers may offer." Miller, 123 S. Ct. 1477-78. By contrast, bad faith claims, whether common law or statutory, merely provide an additional remedy for policyholders. See Gaylor, 112 F.3d at 466 ("[Oklahoma bad faith law] does not effect a change in the risk borne by insurers and the insured, because it does not affect the substantive terms of the insurance contract. On the other hand, a law mandating that a certain disease be covered under health insurance contracts would effect a spread of risk, both from insureds to insurers, and among the insureds themselves."); Nguyen v. Healthguard of Lancaster, Inc., – F. Supp. 2d –, No. CIV.03-3106, 2003 WL 22100157, at *8 (E.D. Pa. Aug. 14, 2003) (Pennsylvania bad faith statute by providing an additional remedy for insureds if contract is breached, "bears no relation to the risk insured against, . . . even though [it] may raise the premiums insureds must pay for their coverage."). As the Colorado federal district court in Denette v. Life of Ind. Ins. Co., 693 F. Supp. 959 (D. Colo. 1988), noted with regard to Colorado's bad faith law, "[T]here is no

indication that the statutes . . . have any effect of transferring or spreading policy holder risk. . . . [T]hese statutes do not purport to regulate the substantive terms or content of insurance policies by mandating certain benefits."). Id. at 966.

An examination of Tenth Circuit case law on the preemption of state law bad faith claims under ERISA underscores our conclusion that bad faith claims will rarely, if ever, be saved from preemption. In Kelley v. Sears, Roebuck & Co., 882 F.2d 453 (10th Cir. 1989), this court held that ERISA preempted a Colorado bad faith claim, finding that Colorado's law is "'very similar in substance' to the Mississippi law at issue in Pilot Life." Id. at 456 (quoting Denette, 693 F. Supp. at 966). Tracking the language of Pilot Life, the court held in Kelley that (1) "Colorado's common law of bad faith does not regulate insurance," insofar as (2) "[i]t neither spreads policyholder risk nor controls the substantive terms of the insurance contract," (3) "[a]lthough associated with the insurance industry, [Colorado bad faith law] developed from the general principles of tort and contract law," and (4) "Colorado's common law of bad faith conflicts with ERISA's civil enforcement remedies." Id.

The Kidneighs fail to overcome Kelley's precedential value in this case. According to the Kidneighs, the Supreme Court's decisions in Ward and Miller worked a wholesale reconsideration of ERISA preemption analysis, and pre-Ward Tenth Circuit case law (and, by implication, pre-Ward Supreme Court cases such

as Pilot Life) is not controlling here. This argument, however, is hard to square with the continued citation to Pilot Life in recent Supreme Court cases and citations to Kelley in recent Tenth Circuit cases. See Moffett, 291 F.3d at 1236-37 (10th Cir. 2002) ("[W]e conclude that Wyoming's law does not regulate insurance such that it falls within ERISA's saving clause. Wyoming's bad faith law does not have the effect of transferring or spreading policyholder risk.") (citing Kelley, 882 F.2d at 456). Recent Supreme Court and Tenth Circuit cases indicate that, while the precise formulation of the test for analyzing ERISA preemption cases has evolved, the holdings of prior cases are still valid as to the preemption of bad faith claims.

The Kidneighs similarly overstate the effect of Miller on this case when they claim in their Supplemental Brief that "[p]rior case law from the Supreme Court and this Circuit holding that state bad faith laws are preempted based upon a McCarran-Ferguson analysis are now without precedential value" and that "[t]he Supreme Court has thus eviscerated the precedential value of Pilot Life." Aplt. Supp. Br. at 1-2. On the contrary, the Court in Miller notes that the now-discarded McCarran-Ferguson factors used in Pilot Life were, in the earlier opinion, "mere 'considerations [to be] weighed' in determining whether a state law falls under the savings clause," 123 S. Ct . at 1479 (quoting Pilot Life, 481 U.S. at 49), and that in none of the Court's ERISA preemption decisions were "the

McCarran-Ferguson factors an essential component of the [preemption] analysis," id. (discussing Metro. Life, 471 U.S. at 742-43, and Ward, 526 U.S. at 374). Had the Supreme Court intended Miller to overrule Pilot Life or, in the Kidneighs' words, eviscerate its precedential value, the Court could have said as much; the fact that Pilot Life is still cited in Miller with approval suggests otherwise. See also Leuthner v. Blue Cross and Blue Shield, 270 F. Supp. 2d 584, 592-94 (M.D. Pa. 2003) (applying Miller and relying upon reasons in Pilot Life to conclude that Pennsylvania bad faith statute did not affect risk pooling arrangement); McGuigan v. Reliance Standard Life Ins. Co., 256 F. Supp. 2d 345, 348 (E.D. Pa. 2003) (same).

Nor is the Kidneighs' argument availing that Colorado law governing bad faith claims has evolved to the point where a case from 1989 (Kelley) is no longer applicable in 2003. The statute on insurance unfair competition and deceptive practices in Colorado cited by the Kidneighs–enacted before Kelley–merely provides remedies for and prevents unfairness in the insurance industry and states that juries in civil cases against insurance companies may be instructed that "the insurer owes its insured the duty of good faith and fair dealing." Colo. Rev. Stat. Ann. § 10-3-1113(1) (West 2003). Colorado is hardly the only state to attempt to so distinguish generic contract bad faith and insurance bad faith; several states have similar insurance bad faith statutory provisions, and they are routinely held

to be expressly preempted by ERISA. See, e.g., Gilbert v. Alta Health & Life Ins. Co., 276 F.3d 1292, 1297-99 (11th Cir. 2001) (Alabama insurance bad faith statute preempted by ERISA); Gaylor, 112 F.3d at 466 (Oklahoma insurance bad faith statute preempted by ERISA); Swerhun v. Guardian Life Ins. Co. of Am., 979 F.2d 195, 199 (11th Cir. 1992) (Florida insurance bad faith statute preempted by ERISA).

As to Mrs. Kidneigh's loss of consortium claim, the Kidneighs concede that preemption of Mr. Kidneigh's bad faith claim would entail preemption of Mrs. Kidneigh's loss of consortium claim:

> [A]s a derivative claim, a claim for loss of consortium is only as valid as the claim from which it derives. In essence it is no more than an element of damages that comes with the principal claim . . . . [A] loss of consortium claim is not preempted if the claim it derives from is not preempted, but it is preempted if ERISA preempts the principal claim.

Aplt. Br. at 11-12 (citing Pacificare of Okla., Inc. v. Burrage, 59 F.3d 151 (10th Cir. 1995)). This result is true whether the loss of consortium claim is understood to derive from the bad faith claim (as the Kidneighs contend) or from the ERISA claim (as UNUM contends). If the former, then the Kidneighs' concession above controls. If the loss of consortium claim is derived from the ERISA claim, then the loss of consortium claim is best characterized as a state law claim preempted by ERISA. See Bast v. Prudential Ins. Co. of Am., 150 F.3d 1003, 1009-10 (9th Cir. 1998); Burrage, 59 F.3d at 155 ("A loss of consortium claim against an

[insurer] alleging negligent or fraudulent administration of the plan is preempted by ERISA."). The plain language of ERISA and prevailing Supreme Court and Tenth Circuit authority lead, then, to the conclusion that Mr. Kidneigh's Colorado state law bad faith claim is preempted by ERISA and that his wife's loss of consortium is similarly preempted.

We are unpersuaded that Elliot v. Fortis Benefits Ins. Co., 337 F.3d 1138 (9th Cir. 2003), suggests a different result. That case held that a state-law unfair trade practices act claim was preempted under ERISA's civil enforcement provision, 29 U.S.C. § 1132, relying upon Pilot Life. Elliot, 337 F.3d at 1147. The court found that the state act "provides damages above and beyond those provided in ERISA, including punitive damages," and was therefore preempted by § 1132. Id. Though the opinion contains an interesting discussion concerning the evolution of § 1144 preemption, the court did not reach whether (1) the state act was specifically directed toward entities engaged in insurance and (2) whether it substantially affects the risk pooling arrangement between the insurer and the insured. Elliot, 337 F.3d at 1146. Notwithstanding the dissent and its reliance on Elliot, we remain persuaded that neither factor is present here.

The district court's decision is AFFIRMED in part (as to Mrs. Kidneigh's loss of consortium claim) and REVERSED in part (as to Mr. Kidneigh's bad faith claim).

Kidneigh v. UNUM Life Ins. Co. of America, 02-1277, -1282
**Henry, J**., concurring in part and dissenting in part.


I concur in the majority's holding that Mr. Kidneigh's Colorado bad faith

claim is foreclosed by ERISA conflict preemption. See Maj. Op. at 5-7. Because

I agree that "preemption of Mr. Kidneigh's bad faith claim . . . entail[s]

preemption of Mrs. Kidneigh's loss of consortium claim," id. at 15, I therefore

also concur in the ultimate holding that the Kidneighs' claims are "preempted by

ERISA." Id. at 16. My agreement with the majority, however, ends there.

Two aspects of the majority's reasoning concern me. First, the majority's

ERISA direct preemption analysis, see id. at 8-15, is unnecessary to our ultimate

holding. Second, the majority's conclusion following that analysis, that Mr.

Kidneigh's Colorado insurance bad faith claim is foreclosed by ERISA direct

preemption, is problematic.


**A.      The Majority's Direct Preemption Analysis is Unnecessary**

Justice Breyer has warned of the need in certain situations for "judicial

caution and humility."[1] This is one of those situations: we should be very careful

in invalidating state legislatures' actions under federal law. To decide this case,

we did not need to go any further than the majority's concise and correct

_____

[1] Stephen Breyer, Our Democratic Constitution, 77 N.Y.U. L. Rev. 245, 261
(2002).

application of the ERISA conflict preemption rules from <u>Rush Prudential HMO, Inc. v. Moran</u>, 536 U.S. 355, 375 (2002), and <u>Conover v. Aetna U.S. Health Care, Inc.</u>, 320 F.3d 1076 (10th Cir. 2003), to the remedies sought by the plaintiffs. <u>See</u> Maj. Op. at 5-7.

"This court considers itself *bound* by Supreme Court dicta almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements." <u>Gaylor v. United States</u>, 74 F.3d 214, 217 (10th Cir. 1996) (emphasis supplied). As the majority explains, <u>see</u> Maj. Op. at 5-7, a state law regulating insurance is foreclosed by ERISA conflict preemption if it allows plan participants to obtain remedies not available under ERISA. And as the majority concedes, <u>see id.</u> at 7, the Supreme Court has made clear that if a state law claim is foreclosed by ERISA conflict preemption, that claim is foreclosed *regardless* of whether the law on which the claim is based is, or is not, foreclosed by the doctrine of direct preemption. <u>See Rush</u>, 536 U.S. at 377 ("Although we have yet to encounter a forced choice between the congressional policies of exclusively federal remedies and the reservation of the business of insurance to the States, *we have anticipated such a conflict, with the state insurance regulation losing out if it allows plan participants to obtain remedies that Congress rejected in ERISA*") (internal citations and quotation marks omitted) (emphasis supplied); <u>Boggs v. Boggs</u>, 520 U.S. 833, 841 (1997) ("*We*

- 2 -

*can begin, and in this case end,* the analysis by simply asking if state law conflicts with the provisions of ERISA or operates to frustrate its objects. We hold that there is a conflict, which *suffices* to resolve the case. We need not inquire whether the statutory phrase 'relate to' provides further and additional support for the pre-emption claim.") (emphasis supplied); cf. Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 142 (1990) ("*Even if* there were no express pre-emption in this case, the Texas cause of action would be pre-empted because it conflicts directly with an ERISA cause of action.") (emphasis supplied).

Indeed, on several occasions, the Supreme Court has addressed conflict preemption as a basis independent of direct preemption for holding that ERISA superseded the common law tort claim in a given case. See Pilot Life Ins. Co. v. Dedaux, 481 U.S. 41, 51-57 (1987); Ingersoll-Rand, 498 U.S. at 142-45. Significantly, in its recent ERISA preemption cases the Court has assumed that ERISA conflict preemption could foreclose a state claim even if the state law in question fell within ERISA's insurance savings clause. See, e.g., Rush, 536 U.S. at 374-87 (performing ERISA conflict preemption after rejecting an ERISA direct preemption claim); UNUM Life Ins. Co. of Am. v. Ward, 526 U.S. 358, 375-77 (1999) (same).

The necessary logical predicate of these cases is that ERISA direct preemption and ERISA conflict preemption operate *independently* from each

other.  Put another way, a state statute is preempted, and a claim based on that statute foreclosed, when the party asserting ERISA preemption satisfies the applicable standard for *either* of the two main flavors of ERISA preemption, direct or conflict.  When one of those two types of ERISA preemption is demonstrated, it is wholly unnecessary for a court to engage in analysis of whether the other ERISA preemption doctrine applies.  The majority does not attempt to dispute this principle.

Nonetheless, the majority, having correctly determined that the claims are barred by ERISA conflict preemption, ventures unnecessarily and at length further down that "treacherous path," as it accurately terms ERISA preemption analysis, Op. at 4, by engaging in ERISA direct preemption analysis.  The majority makes an ERISA direct preemption holding "in the alternative," Maj. Op. at 8, reaching to interpret as a matter of first impression the test recently announced in Kentucky Ass'n of Health Plans, Inc. v. Miller, 123 S. Ct. 1471 (2003).  Although such certainty and courage may in some contexts warrant admiration, I am concerned that the majority misapplies Miller.  I therefore address also the majority's ERISA direct preemption analysis.

**B.      Colorado's Insurance Bad Faith Law is Not Foreclosed by ERISA Direct Preemption**

**1.      ERISA's Direct Preemption and Insurance Savings Clauses**

ERISA "comprehensively regulates employee pension and welfare plans." Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 724, 732 (1985).  Benefit providers may either self-insure or purchase insurance for their beneficiaries.  See id.  Plans such as the Kidneighs' that purchase insurance "are directly affected by state laws that regulate the insurance industry."  Id.  The question in such cases becomes whether the state law at issue is preempted by ERISA.  ERISA contains an express, or direct, preemption provision, which states that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan."  29 U.S.C. § 1144(a); see also Conover, 320 F.3d at 1079.

In a legislative act that the Supreme Court has described politely as "perhaps. . . not a model of legislative drafting," Metropolitan Life, 471 U.S. at 739, Congress, despite the breadth of ERISA's direct preemption clause, followed that clause with an insurance savings clause, which "saves from preemption state laws 'regulat[ing] insurance.'" Conover, 320 F.3d at 1078 (quoting 29 U.S.C. § 1144(b)(2)(A)).  The insurance savings clause "reclaims a substantial amount of ground with its provision that 'nothing in this subchapter shall be construed to

- 5 -

exempt or relieve any person from any law of any State which regulates insurance.'" Rush, 536 U.S. at 364 (quoting 29 U.S.C. § 1144(b)(2)(A)).

Thus, "employee benefit plans that are insured are subject to indirect state insurance regulation." FMC Corp. v. Holliday, 498 U.S. 52, 61 (1990). "An insurance company that insures a plan remains an insurer for purposes of state laws purporting to regulate insurance." Id. (internal quotation marks omitted). "The insurance company is therefore *not relieved* from state insurance regulation." Id. (emphasis supplied). The Supreme Court has noted that this distinction reflects "the presumption that Congress does not intend to pre-empt areas of traditional state regulation. . . . Congress provided that the 'business of insurance, and every person engaged therein, *shall be subject to the laws of the several States* which relate to the regulation or taxation of such business.'" Id. at 62 (quoting 15 U.S.C. § 1012(a)) (emphasis supplied).

It is undisputed that the Kidneighs' claims "relate" to an employee benefit plan. Thus, resolution in this case of whether ERISA direct preemption applies turns on whether Colorado's insurance bad faith law "escape[s] preemption under the saving clause." Ward, 526 U.S. at 367 (citing 29 U.S.C. § 514(b)(2)(A)). "To determine whether [Colorado's laws] are saved from preemption, we must ascertain whether they are 'laws . . . which regulate insurance' under § 1144(b)(2(A)." Miller, 123 S. Ct. at 1475.

## 2. Applying Miller

The Supreme Court's most recent interpretation of § 1144's "regulate insurance" language came in Miller, 123 S. Ct. 1471, a unanimous decision handed down in April of this year. The majority states that Miller effected merely a change in the "precise formulation of the test for analyzing ERISA preemption cases." Maj. Op. at 13. However, as recognized by the only circuit decision to interpret Miller, Miller announced a "*change* in the law involving § 1144." Elliot v. Fortis Benefits Ins. Co., 337 F.3d 1138, 1145 (9th Cir. 2003) (noting that under the new risk standard, state laws might be found to regulate insurance "under a much wider variety of statutes" than earlier Supreme Court caselaw suggested) (emphasis supplied). See also Rosenbaum v. UNUM Life Ins. Co. of Am., No. 01-6758, 2003 WL 22078557 (E.D. Pa. Sept. 8, 2003); 2 Guide to Employment Law and Regulation § 19:39 (June 2003) (noting that "[t]he rationale utilized by the Supreme Court [in Miller] is contrary to its previous decisions that set forth a test for determining whether laws regulate insurance within the meaning of ERISA.").

Indeed, prior to Miller, courts were required to follow the test set forth in Metropolitan Life: (1) asking whether, from a "common-sense view of the matter," a state law "regulates insurance," and (2) testing that result against the factors interpreting the "business of insurance" antitrust exemption in the

- 7 -

McCarran-Ferguson Act. <u>Metropolitan Life</u>, 471 U.S. at 743; <u>Conover</u>, 320 F.3d at 1078. The Court in <u>Miller</u> explained that its "*prior* decisions construing § 1144(b)(2)(A) have relied, to varying degrees, on our cases interpreting §§ 2(a) and 2(b) of the McCarran-Ferguson Act." 123 S. Ct. at 1478 (emphasis supplied). "In determining whether certain practices constitute 'the business of insurance' under the McCarran-Ferguson Act," noted the Court, "our cases have looked to three factors: first, whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry." <u>Id.</u> (internal quotation marks omitted) (emphasis deleted).

The Court then indicated its dissatisfaction with the pre-<u>Miller</u> doctrine:

> our use of the McCarran-Ferguson case law in the ERISA context has misdirected attention, failed to provide clear guidance to lower federal courts, and, as this case demonstrates, added little to the relevant analysis. That is unsurprising, since the statutory language of § 1144(b)(2)(A) differs substantially from that of the McCarran-Ferguson Act.

<u>Id.</u>

The Court then made *new law* and announced a two-part test:

> Today we make a *clean break* from the McCarran-Ferguson factors and *hold* that for a state law to be deemed a "law . . . which regulates insurance" under § 1144(b)(2)(A), it must satisfy two requirements. First, the state law must be specifically directed toward entities engaged in insurance. Second, as explained above, the state law must

- 8 -

substantially affect the risk pooling arrangement between the insurer and the insured.

Id. at 1479 (internal quotation marks and select internal citations omitted) (emphasis supplied).

Thus, under Miller, we analyze whether Colorado's insurance bad faith law "regulates insurance," and therefore falls within ERISA's insurance savings clause. 29 U.S.C. § 1144(b)(2)(A). In this context, we examine both Colorado's decisional and statutory law. See Winchester v. Prudential Life Ins. Co. of Am., 975 F.2d 1479, 1484 n.5 (10th Cir. 1992). As the majority acknowledges, see Maj. Op. at 8, we thus ask whether Colorado's insurance bad faith law is (1) "specifically directed toward entities engaged in insurance," Miller, 123 S. Ct. at 1479; and (2) "substantially affect[s] the risk pooling arrangement between the insurer and the insured." Id. However, the majority's cramped interpretation of Miller infects its analysis on both Miller prongs.

### a. Specifically directed towards entities engaged in the insurance industry

The majority concludes that Colorado's insurance bad faith law is not specifically directed at entities engaged in the insurance industry, reasoning that Colorado courts have "not exclusively [] confined bad faith causes of action to

- 9 -

the insurance setting." Maj. Op. at 9. In doing so, the majority erroneously conflates two separate causes of action that happen to include the words "bad faith," but are quite distinct under well-settled Colorado law.

The first such cause of action is a bad faith claim that sounds in contract and arises from an alleged breach of the implied covenant of good faith and fair dealing that Colorado imports into every contract. See, e.g., Maj. Op. at 9 (citing Rogers v. Westerman Farm Co., 29 P.3d 887, 908 (Colo. 2001) (claim against oil company for breach of implied covenant of good faith and fair dealing), and Amoco Oil Co. v. Ervin, 908 P.2d 493, 498 (Colo. 1995) (same)). The second is an insurance bad faith claim that sounds in tort and exists solely due to the unique relationship of a surety–insured such as that present in the cases cited by the majority. See Maj. Op. at 9 (citing Dale v. Guar. Nat'l Ins. Co., 948 P.2d 545, 552 (Colo. 1997) (analyzing "the tort of bad faith breach of insurance contract"), and Vaughan v. McMinn, 945 P.2d 404, 406 (Colo. 1997) ("A breach of the covenant of good faith and fair dealing by an insurer may give rise to tort liability. The basis for this liability is the special nature of the insurance contract relative to other types of contracts.")).

Contrary to the majority's insistence, in Colorado, "[c]laims for bad faith breach . . . of an insurance contract sound in *tort. . . . [and] exist independently of the liability imposed by an insurance contract.*" Pham v. State Farm Mut. Auto.

Ins. Co., 70 P.3d 567, 571 (Colo. Ct. App. 2003) (emphasis supplied) (citing Daugherty v. Allstate Ins. Co., 55 P.3d 224 (Colo. Ct. App. 2002), and Flickinger v. Ninth Dist. Prod. Credit Ass'n, 824 P.2d 19 (Colo. Ct. App. 1991)). Accordingly, Colorado courts have analyzed bad faith claims brought against insurers not in terms of general "bad faith" claims, but specifically as "*insurance bad faith claim[s].*" Dale, 948 P.2d at 551 (emphasis supplied); see also Herod v. Colo. Farm Bur. Mut. Ins. Co., 928 P.2d 834, 835 (Colo. Ct. App. 1996) (stating that in "cases in which the insured brings an action against the insurer, the insurer's denial of a valid claim will constitute bad faith if the insurer's conduct is unreasonable and it knows that the conduct is unreasonable or recklessly disregards the fact that the conduct is unreasonable"). Indeed, earlier this year, the Colorado Supreme Court reaffirmed that "[t]he basis for liability in tort for the breach of an insurer's implied duty of good faith and fair dealing is grounded upon the *special nature of the insurance contract and the relationship which exists between the insurer and the insured.*" Cary v. United of Omaha Life Ins. Co., 68 P.3d 462, 467 (Colo. 2003) (quoting Travelers Ins. Co. v. Savio, 706 P.2d 1258, 1272 (Colo. 1985) (emphasis supplied)).

That there is a distinct body of insurance bad faith law pertaining to the insurance industry is no mere tautology. Insurance-specific policy considerations underlie Colorado's insurance bad faith tort cause of action. As the Colorado

Supreme Court has explained, the doctrine reflects that "[t]he motivation of the insured when entering into an insurance contract differs from that of parties entering into an ordinary commercial contract." Cary, 68 P.3d at 467 (internal quotation marks and citation omitted). "[A]n insurer in contractual privity with an insured, has a financial incentive to use its leverage to limit claims," id., the Colorado Supreme Court has noted, because "once a calamity has befallen an employee covered by workers compensation or an insured covered under a private insurance contract, the injured party is particularly vulnerable because of the injury or loss." Id. (internal quotations and citation omitted) (emphasis supplied).

The concern expressed by the Colorado Supreme Court is that large-scale "[i]nsurers, backed by sufficient financial resources, are encouraged to delay payment of claims to their insureds with an eye toward settling for a lesser amount than due under the policy." Id. (internal quotation marks omitted). Regarding claims for disability coverage, the Colorado Supreme Court has noted that "[t]he inequity of this situation becomes particularly apparent in the area of disability insurance in which the insured [is] often pursued by creditors and devoid of bargaining power." Id. (internal quotation marks omitted).

The Colorado legislature has similarly carved out a distinct set of laws applicable to insurance companies' bad faith behavior. The majority's conclusion that Colorado's insurance bad faith law is not specifically directed towards

entities engaged in insurance lies in contrast with the following. In 1987, the Colorado legislature amended the Chapter 65 of its civil code, the chapter addressing "The Regulation of Insurance Companies." In an Act titled, "Concerning Remedies for Persons Injured by Acts of Insurance Companies Which Constitute Unfair Settlement Practices," 1987 Colo. Leg. Sess., Vol. I at 423, the Colorado legislature enacted § 10-3-1113 to supplement the state's common law insurance bad faith tort law. See id. at 423-424 (codifying the enactment of Colo. Stat. §§ 10-3-1113 and 10-3-1114). See also COL. REV. STAT. § 10-3-1114 ("Nothing in this part . . . shall be construed to . . . abrogate any common law contract or tort cause of action."). The statute provides a standard applicable *only to bad faith claims against insurance providers*; it mandates jury instructions that shall apply in a bad faith claim "[i]n any civil action for damages founded upon contract, or tort, or both against an insurance company," and states that "the trier of fact may be instructed that the insurer owes its insured the duty of good faith and fair dealing, which duty is breached if the insurer delays or denies payment without a reasonable basis for its delay or denial."COL. REV. STAT. § 10-3-1113.

Section 10-3-1113(4) states that "[i]n determining whether an insurer's delay or denial was reasonable, the jury may be instructed that willful conduct of the kind set forth in sections 10-3-1104(1)(h)(I) to (1)(h)(XIV) is prohibited and

- 13 -

may be considered if the delay or denial and the claimed injury, damage, or loss was caused by or contributed to by such prohibited conduct." Those provisions define "as unfair methods of competition and unfair or deceptive acts or practices in the *business of insurance*" (emphasis supplied), numerous and unmistakable references to the conduct of insurance companies, including

> Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies; or
>
> Failing to adopt and implement reasonable standards for the prompt investigation of *claims arising under insurance policies*; or
>
> Refusing to pay claims without conducting a reasonable investigation based upon all available information; or
>
> Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed; or
>
> *Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear*; or
>
> Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds; or
>
> Attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made

part of an application;

COL. REV. STAT. § 10-3-1104(1)(h)(II)-(VIII) (emphasis supplied).

Both this statute's insurance-specific standard for any suit alleging a bad faith tort claim brought by an insured against a direct insurance provider such as UNUM, *and* the Colorado common law governing insurance bad faith torts under standards specific to the insurance setting, are thus distinct in a meaningful way from the contract law bad faith cause of action the majority repeatedly invokes.

Further evidence of this distinction is that the type of bad faith claim at issue here has*,* contrary to the majority's assertion, see Maj. Op. at 9, been cabined exclusively to the insurance setting. Unlike the laws of certain jurisdictions cited by the majority, see Maj. Op. at 7 and 13, the statutory and common law rules governing insurance bad faith tort law in Colorado have *not* been extended to other situations where special circumstances create unique duties. Compare, e.g., Moffett v. Halliburton Energy Servs., Inc., 291 F.3d 1227, 1236 (10th Cir. 2002) (in holding that Wyoming's bad faith law did not regulate insurance, emphasizing that "the tort of bad faith breach as developed in Wyoming is not unique to the insurance industry; rather, it is unique to those settings in which a 'special relationship' exists, including the insurance and employment contexts") with Decker v. Browning-Ferris Indus. of Colo., Inc., 931 P.2d 436, 446 (Colo. 1997) (noting that "the torts of wrongful discharge in

- 15 -

violation of public policy and bad faith breach of the implied covenant of good faith and fair dealing inherent in insurance contracts are based on administrative or legislative declarations of public policy," and concluding that "*there is no appropriate basis upon which to ground a tort of breach of an express covenant of good faith and fair dealing in employment contracts*") (emphasis supplied). Unlike the claim under Mississippi law for "tortious breach of contract" held to be preempted by ERISA in Pilot Life, 481 U.S. at 48, insurance bad faith tort law in Colorado, in both common law and statute form, is entirely reflective of, and focused on, the insurance industry. Accord Elliot, 337 F.3d at 1145 (in analyzing a state law under Miller, asserting that the state law satisfies Miller's first prong because the state law "by its very terms is directed at insurance, and contains provisions applicable only to insurance companies."); Colligan v. UNUM Life Ins. Co. of Am., No. Civ. A000-K-2512, 2001 WL 533742, at *3 (D. Colo. April 23, 2001) (in denying an insurer's motion to dismiss on ERISA preemption grounds a Colorado insurance bad faith claim, concluding that "Colorado's bad faith cause of action is clearly distinguishable from the Mississippi cause of action at issue in *Pilot Life*").

Moreover, contrary to the exclusivity standard posited by the majority, *even if* there existed de minimus exceptions to Colorado's exclusive application of insurance bad faith tort law to the insurance context, such exceptions would not

preclude the Colorado law from falling within ERISA's savings clause. The Court noted in Miller noted that "Petitioners maintain that the application to noninsuring HMOs forfeits the laws' status as "law[s] . . . which regulat[e] insurance." § 1144(b)(2)(A)." 123 S. Ct. at 1476 n.1  The court responded: "We disagree. . . . petitioners' argument is foreclosed by Rush [] where we noted that Illinois' independent-review laws contained '*some overbreadth in the application of* [the Illinois statute at issue] *beyond orthodox HMOs*,' yet held that '*there is no reason to think Congress would have meant such minimal application to noninsurers to remove a state law entirely from the category of insurance regulation saved from preemption*.'" Id. (quoting Rush, 536 U.S. at 372) (emphasis supplied) (internal citation omitted).  For these reasons, it is clear that Colorado's insurance bad faith law is "specifically directed toward entities engaged in insurance." Miller, 123 S. Ct. at 1479.

### b. "Substantially affect the risk pooling arrangement between the insurer and the insured"

The majority also concludes that Colorado's insurance bad faith law fails Miller's second prong, which requires that for a state law to qualify as regulating insurance, it must "substantially affect the risk pooling arrangement between the insurer and the insured." Id.  To arrive at this conclusion, the majority relies

heavily on <u>Pilot Life</u>, <u>Kelley v. Sears, Roebuck & Co.</u>, 882 F.2d 453 (10th Cir. 1989), ("The Kidneighs fail to overcome <u>Kelley</u>'s precedential value in this case."), and a number of other circuit court cases applying <u>Pilot Life</u>.

However, notwithstanding the majority's assertions that because <u>Pilot Life</u> has not been completely overruled and that <u>Pilot Life</u> and its progeny in this circuit are therefore binding, those authorities' precedential value on the *precise* issue of the "substantially affect" prong has been seriously eroded, if not eviscerated, by <u>Miller</u>. On this issue, the Court in <u>Miller</u> decidedly did *not* favorably cite to <u>Pilot Life</u>. Indeed, as another circuit court recently put it in assessing <u>Pilot Life</u>'s conclusions regarding risk, "subsequent case law puts the validity of . . . these <u>Pilot Life</u> conclusions into some doubt." <u>Elliot</u>, 337 F.3d at 1144.

A comparison between the rule from <u>Pilot Life</u> and the new standards suggested by recent Supreme Court cases and expressly adopted in <u>Miller</u> shows how <u>Pilot Life</u>'s risk allocation analytical framework has been displaced by subsequent Supreme Court decisions. The Court in <u>Pilot Life</u> concluded that a claim brought under Mississippi common law for tortious breach of an insurance contract was "not saved by § 514(b)(2)(A)," and was therefore foreclosed by ERISA direct preemption. 481 U.S. at 57. In so holding, the Court emphasized that the Mississippi common law claim at issue was "firmly planted in the general

- 18 -

principles of Mississippi tort and contract law," id. at 50, reasoning that "the common law of bad faith does not define the terms of the relationship between the insurer and the insured; it declares only that, whatever terms have been agreed upon in the insurance contract, a breach of that contract may in certain circumstances allow the policyholder to obtain punitive damages," id. at 51, and stressing that "the Mississippi common law of bad faith does not effect a spreading of shareholder risk." Id. at 50.

Miller, in contrast, specifically disavowed the McCarran-Ferguson factors, including the test of "whether the practice has the effect of transferring or spreading a policyholder's risk," the test relied on in Pilot Life, 481 U.S. at 48, and in Kelley, 882 F.2d at 456 ("Colorado's common law of bad faith does not regulate insurance. It neither spreads policyholder risk nor controls the substantive terms of the insurance contract. See Pilot Life."). The Court in Miller stated: "[O]ur test requires *only* that the state law substantially *affect* the risk pooling arrangement between the insurer and the insured; it does *not* require that the state law actually *spread* risk." 123 S. Ct. at 1477 n.3 (all but second emphasis supplied). Perhaps animated by federalism concerns, Miller expanded the scope in ERISA direct preemption analysis as to what affects risks. The Court's use of the word "only" to describe the new test shows that "[s]ubstantially affect[ing] the risk pooling arrangement between the insurer and the insured" is

likely an easier hoop to jump through. See Elliot, 337 F.3d at 1145 (stating that Ward and Miller "leave open the possibility that risk spreading might be found in a *much wider variety* of statutes than Pilot Life suggested") (emphasis supplied). Miller is the culmination, so far, of a clear trend by the Supreme Court to rein in ERISA direct preemption. Ward and Rush, the two ERISA direct preemption cases decided immediately prior to Miller, each concluded that the risk analysis did not justify ERISA direct preemption, as did Miller itself.

In Ward, 526 U.S. 358, decided in 1999, the Court held that California's notice-prejudice rule, under which an insurer could not deny benefits due to an insured's late notice without showing that the insurer suffered prejudice, fell within ERISA's savings clause. In so holding, the Court reasoned that "the rule controls the terms of the insurance relationship" and is directed at the insurance industry. Id. at 368.

In Rush, 536 U.S. 355, decided in 2002, the Court held that an Illinois law mandating a binding review by an independent physician following an insurer's refusal to pay for surgery fell within the savings clause. The Court in Rush reasoned that "this effect of eliminating an insurer's autonomy to guarantee terms congenial to its own interests is the stuff of garden variety insurance regulation through the imposition of standard policy terms." Id. at 387.

Miller, decided unanimously earlier this year, analyzed whether Kentucky's

"Any Willing Provider" ("AWP") statutes fell within ERISA's savings clause. The AWP statutes required health insurance plans to provide access to the plans' network to all health care providers in the plans' geographic coverage region willing to meet insurer's participation requirements. See Miller, 123 S. Ct. at 1473-74 (summarizing Ky. Rev. Stat. Ann. § 304.17A-270). Miller was the Court's first-*ever* application of the "substantially affects" version of the risk prong. Holding that the AWP statutes satisfied the risk prong, the Court stated that the "rule [that] governs whether or not an insurance company must cover claims submitted late, which dictates to the insurance company the conditions under which it must pay for the risk that it has assumed . . . .certainly qualifies as a substantial effect on the risk pooling arrangement between the insurer and insured." Id. at 1478 n.3.

If, contrary to the Supreme Court's teachings discussed earlier, it was necessary to address this matter, I would hold that Colorado's insurance bad faith law fits within this unbroken line of recent Supreme Court cases as sufficiently affecting the pooling of risk to qualify as a regulation of insurance. As amended in 1987,[2] Colorado statutory law requires that insurers attempt to settle when

---

[2]    The fact that the Colorado legislature passed the amendment at issue in this case in 1987 is an additional reason that Kelley, contrary to the majority's assertions, does not control. Though decided by this court in 1989, Kelley involved a claim brought under the Colorado bad faith statue as it stood prior to the important amendments enacted in 1987 to Colorado's insurance bad faith

liability becomes reasonably clear, and forbidding insurers from offering less than what a reasonable person would feel entitled to, Colorado's insurance bad faith law "substantially affects the risk-pooling arrangement."  Even without the additional remedies foreclosed by ERISA conflict preemption, it tends to make it less likely that insureds will suffer from delayed settlement.

Colorado's law effects this alteration of risk by making *clear* that such behavior may yield liability against the insurer, presumably altering the insurer's incentives to play the "delay game" and drive down settlement amounts.  By mandating that insurers attempt to settle when liability becomes reasonably clear and barring insurers from offering less than what a reasonable person would feel entitled to, Colorado's insurance bad faith law "dictates to the insurance company the conditions under which it must pay for the risk it has assumed."  Miller, 123 S. Ct. at 1477 n.3.  Accord Elliot, 337 F.3d at 1145 (noting that Supreme Court decisions subsequent to Pilot Life "call[] into question Pilot Life's conclusion that a claim processing law does not affect risk allocation").  The greater likelihood of the imposition of liability for bad faith behavior makes bad behavior more costly.  As the cost of bad behavior rises, behavior tends to change.  The statute thus changes the conditions under which an insurer will "pay for the risk

statutory law.  See Kelley, 882 F.2d at 455 ("[Kelley] . . . asserted causes of action under Colorado's common law of bad faith insurance practices and Colo. Rev. Stat. § 10-3-1104 (1973)").

that it has assumed," <u>Miller,</u> 123 S. Ct. at 1478 n.3, by making the law decisively clear that the risk of nonperformance in settlement negotiations lies with the insurer.

Colorado's insurance bad faith law thus substantially affects the risk-pooling arrangement by giving insureds clear protection they did not previously possess in their settlement negotiation practices with insurers. Because this law satisfies both of the requisite elements to qualify as "regulating insurance," it thus falls with ERISA's savings clause.

## CONCLUSION

ERISA was enacted as a balanced statute, offering certain protection to insurers while securing protection for insured patients who are at their most vulnerable when they suffer medical harm. Through the insurance savings clause, Congress specifically authorized the states to continue regulating the business practices of insurance companies. State regulation of insurance is an undeniably proper state function that permits states to respond to the specific aspects of their policy problems better than the one-size-fits-all approach the majority's reading emphasizes. The majority's approach helps dismantle the protective system devised by Colorado's legislature and courts for Colorado's citizens.

Because, under binding precedent of the Supreme Court and this court, Mr. Kidneigh's claim is foreclosed by ERISA conflict preemption, I respectfully concur in the majority's disposition of this case. However, I do not join the majority's ERISA direct preemption analysis because, for the reasons detailed above, it is both unnecessary and probably incorrect as a matter of law.